UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) DOCKET NO. 2:19-cr-56-JAW |
| | ) |
| RAFAEL LUGO | ) |
| Defendant | ) |

**MOTION FOR COMPASSIONATE RELEASE**
**18 U.S.C §3582**

NOW COMES the Defendant, by and through counsel, and hereby moves pursuant to 18 U.S.C. §3582 (c)(1)(A)(i) that this Court modify his sentence and immediately release him to home confinement and a period of supervised release. In support of this motion, the Defendant states the following:

1. On December 19, 2019, Defendant was sentenced to 41 months incarceration with supervised release to follow.

2. Defendant is now incarcerated at the Metropolitan Detention Center (MDC) in Brooklyn NY (a BOP facility). His projected release date is January 16, 2022.

3. The unprecedented threat of COVID-19 could not have been foreseen at sentencing, and poses extraordinary risks to Lugo's health. The virus thrives in densely packed populations, and the MDC is ill-equipped to contain the pandemic and prevent COVID-19 from infecting Lugo. His kidney problems make him him especially vulnerable to the deadly risks of COVID-19. Allowing him to finish out his sentence at home is the prudent response to the extraordinary and compelling circumstances created by the virus.

1

Attached for the Court's consideration in connection with this motion are two affidavits that generally address the increased public health risks from keeping at-risk inmates incarcerated during the pandemic, *see* Affidavit of Dr. Brie Williams, attached as Exhibit A, and see an affidavit that specifically addresses conditions at the MDC, Affidavit of Dr. Jonathan Giftos, attached as Exhibit B.

4.  The First Step Act ("FSA") expressly permits Lugo to move this Court to reduce his term of imprisonment and seek compassionate release. *See* 18 U.S.C. § 3583(c)(1)(A)(i). Under normal circumstances, a defendant can seek recourse through the courts after either (1) the BOP declines to file such a motion on his behalf; or (2) there has been of lapse of 30 days from the warden's receipt of the defendant's request, whichever is earlier. *Id.* On March 30, 2020, I transmitted Lugo's request to the warden of MDC via email. Although the BOP has yet to rule on the request (and thirty days have yet to pass), Lugo files this motion now in light of the urgent nature of this matter. *See* discussion, *infra*.

After exhausting the administrative process, "a court may then 'reduce the term of imprisonment' after finding that 'extraordinary and compelling reasons warrant such a reduction' and 'such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.'" *United States v. Ebbers*, 2020 WL 91399, at 4, 02-CR-1144 (VEC) (ECF No. 384) (S.D.N.Y. Jan. 8, 2020). "In making its decision, a court must also consider "the [sentencing] factors set forth in section 3553(a) to the extent that they are applicable."" *Id.* (quoting 18 U.S.C. § 3582(c)(1)(A)).

While courts have noted that the Sentencing Commission's applicable policy statement on what constitutes "extraordinary and compelling reasons" to warrant a sentence reduction is anachronistic because it has not been updated since passage of the FSA, they still continue to be guided by the Sentencing Commission's descriptions of "extraordinary and compelling reason." *See, e.g.*, *Ebbers*, 2020 WL 91399, at 4 (S.D.N.Y. Jan. 8, 2020). However, the

2

Sentencing Commission's statements do not constrain the court's independent assessment of whether "extraordinary and compelling" reasons warrant a sentence reduction in light of the First Step Act's amendments. *United States v. Beck*, 2019 WL 2716505, at 5–6 (M.D.N.C. June 28, 2019); *see also Ebbers*, 2020 WL 91399, at 4. Indeed, "the district courts themselves have the power to determine what constitute extraordinary and compelling reasons for compassionate release." *United States v. Young*, 2020 WL 1047815, at 6 (M.D. Tenn. Mar. 4, 2020).

5.   This Court need not and should not wait for Lugo to exhaust administrative remedies under § 3582(c)(1)(A), as this will almost assuredly exacerbate an already impending public health catastrophe in our jails and prisons, and pose a particular and real danger to Lugo. *See generally Washington v. Barr*, 925 F.3d 109, 120–21 (2d Cir. 2019) ("[U]ndue delay, if it in fact results in catastrophic health consequences, could make exhaustion futile.").

Federal courts have found that they can hear applications prior to the expiration of 30 days (or the exhaustion of administrative remedies) if there is an emergency. *See United States v. Agustin Francisco Huneeus*, No. 19 Cr. 10117 (IT), ECF Docket No. 642 (D. Mass. Mar. 17, 2020) (granting defendant's emergency motion based on COVID-19); *see also United States v. James Arberry*, No. 15 Cr. 594 (JPO), ECF Docket No. 84 (S.D.N.Y. Nov. 12, 2019) (hearing and granting emergency compassionate release application of prisoner with cancer). This accords with general administrative law principles and the exception to administrative exhaustion requirements in numerous statutory schemes. *See, e.g., Hendricks v. Zenon*, 993 F.2d 664, 672 (9th Cir. 1993) (waiving requirement to exhaust administrative remedies where "exceptional circumstances of peculiar urgency are shown to exist") (*citing Granberry v. Greer*, 481 U.S. 129 (1987)); *Washington v. Barr*, 925 F.3d 109, 119 (2d Cir. 2019) (finding that administrative exhaustion requirements can be waived if delay would cause irreparable

3

injury); *Maxwell v. New York Univ.*, 407 F. App'x 524, 527 (2d Cir. 2010) (same).

"[A]pplication of the exhaustion doctrine is 'intensely practical'" and should "be guided by the policies underlying the exhaustion requirement." *Bowen v. City of New York*, 476 U.S. 467, 484 (1986) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 332 n.11 (1976)). Conducting an "intensely practical" analysis of these policies in the context of the Social Security Act's exhaustion requirement, the Supreme Court held in *Bowen* that courts "should be especially sensitive" to irreparable and severe medical harm resulting for blind adherence to a statutory exhaustion requirement, particularly "where the Government seeks to require claimants to exhaust administrative remedies merely to enable them to receive the procedure they should have been afforded in the first place." 476 U.S. at 484 (discussing 42 U.S.C. § 405(g)); *see also Rafeedie v. I.N.S.*, 880 F.2d 506 (D.C. Cir. 1989) (Ginsburg, J., concurring) ("As I see it, a statutory exhaustion requirement, unless Congress explicitly declares otherwise, does not impose an absolute, unwaivable limitation on judicial review; instead, it sets a condition that may be excused when insistence on exhaustion would threaten grave harm to the party seeking review and would not sensibly serve the purposes Congress envisioned in establishing that condition.").

When coupled with the impending crisis, the unique exhaustion provision in § 3582(c)(1)(A) places Lugo's case squarely within *Bowen*'s holding. Under § 3582(c)(1)(A), exhaustion will "merely [ ] enable [Defendants] to receive the procedure they should have been afforded in the first place"—it will simply advance by what could be a crucial thirty days this Court's consideration of Lugo's motion for compassionate release. *Bowen*, 476 U.S. at 484. To wit, § 3582(c)(1)(A) provides that motions for compassionate release are to be brought *either* by the "Director of the Bureau of Prisons, *or* upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf . . . ." 18 U.S.C. § 3582(c)(1)(A) (emphasis added). In other words, § 3582(c)(1)(A)'s exhaustion requirement is not like other

4

statutory exhaustion requirements, which expressly deprive federal courts of jurisdiction to hear disputes in the absence of exhaustion. *Cf. Booth v. Churner*, 532 U.S. 731, 736 (2001) (failure to exhaust under the Prison Litigation Reform Act, 42 U.S.C. § 1997(e), means action cannot be maintained in federal court because that provision explicitly provides that "*[n]o action shall be brought* with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." (emphasis added)).

Rather, § 3582(c)(1)(A) merely controls who (the BOP or the Defendant) moves for compassionate release before the Court, and when (now, or long after COVID-19 has already swept through MDC).

Congress' desire to avoid blind adherence to this "exhaustion" requirement is evidenced by the exception baked into § 3582(c)(1)(A), which provides that Defendants can bypass exhaustion altogether if the warden fails to act on an administrative application for compassionate release within 30 days. § 3582(c)(1)(A) ("[T]he court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf *or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility*, whichever is earlier . . . ." (emphasis added)). With this provision, Congress implicitly recognized that the policies underlying compassionate release are not furthered—and, indeed, actively frustrated—by excessive deference to bureaucratic process. Congress' concerns about delay are even more pronounced in the current public health crisis.

The policies underlying such requirements would not be furthered by strict adherence in this instance. Giving the BOP time to decide administrative applications for compassionate release predicated on COVID-19 concerns would not "afford the parties and the courts the benefit of [the BOP's] experience and expertise." *Salfi*, 422 U.S. at 765. The BOP already has

5

provided its "expert" input on such requests: its "COVID-19 Action Plan" lacks any consideration whatsoever of compassionate release. *See* Federal Bureau of Prisons COVID-19 Action Plan, available at https://www.bop.gov/resources/news/20200313_covid-19.jsp. The MDC Legal Department has confirmed to the Federal Defender in Brooklyn that it has no institution-specific requirements for requesting compassionate release and no specific procedure in place for compassionate release during this pandemic. Thus, it would be futile to force defendants to exhaust their administrative remedies—at the cost of their health and, potentially, their lives.

As discussed below, it is only a matter of time before COVID-19 spreads in the prisons. As one Court held on March 19th:

> The Court is glad to hear that there are currently no reported cases of COVID-19 at Maguire, but is unsure what that means if people are not being tested. And, as the [prison's] management plan itself acknowledges, symptoms of COVID-19 can begin to appear 2-14 days after exposure, so screening people based on observable symptoms is just a game of catch up. That's why the Bay Area is on lockdown. We don't know who's infected. Accordingly, the government's suggestion that Toledo should wait until there is a confirmed outbreak of COVID-19 in Maguire before seeking release, *see* ECF No. 113 at 6 ("If the situation with respect to COVID-19 at Maguire changes, Toledo is free to seek reconsideration of the issue at that point."), is impractical. By then it may be too late. *In the Matter of the Extradition of Alejandro Toledo Manrique*, 2020 WL 1307109, at *1, 19-MJ-71055 (MAG) (TSH) (N.D. Cal., Mar. 19, 2020).

With the speed and unpredictability of this pandemic in New York City—now the

6

epicenter of the pandemic—waiting even 30 days may be too late.  Accordingly, this Court should exercise jurisdiction over Lugo's emergency motion for compassionate release and dispense with the BOP requirements under 18 U.S.C. § 3582(c)(1)(A)(i).

6.     The COVID-19 pandemic continues to roil New York City.  As of April 4, 2020, New York City had over 60,000 confirmed positive cases and 2,254 deaths.  The number is projected to double every few days, with the city deemed an "epicenter" of the crisis.[1]  COVID-19 is already sweeping through the City's Jails and prisons as well.  As of March 25, 2020, at least 52 inmates and prison employees at Rikers Island and other City Jails had tested positive for COVID-19.[2]  Federal facilities are not immune: the BOP has confirmed at least one inmate case and three staff cases at MDC Brooklyn and one inmate case at MCC New York.[3]  The numbers are likely higher, as testing is limited.  *See, e.g.*, *In the Matter of the Extradition of Manrique*, 2020 WL 1307109, at 1 (N.D. Cal. Mar. 19, 2020) (expressing concern about the infection rate within BOP facilities given that "people are not being tested").  A number of other inmates are in isolation or quarantine at both MDC Brooklyn and MCC New York.

Conditions of confinement create an ideal environment for the transmission of highly contagious diseases like COVID-19.  *See* Affidavit of Dr. Brie Williams, at page 3 stating "Because inmates live in close quarters, there is an extraordinarily high risk of accelerated transmission of COVID-19 within jails and prisons.  Inmates share small cells, eat together and use the same bathrooms and sinks. . . . . They are not given tissues or sufficient hygiene

---

[1] *Coronavirus in the U.S.: Latest Map and Case Count*, The New York Times, *available at* https://nyti.ms/2UIkCz4.

[2] Sydney Periera, *Confirmed Coronavirus Cases Rise in New York Jails, Increasing Pressure to Release People in Custody*, *available at* https://gothamist.com/news/confirmed-coronavirus-cases-rise-nyc-jails-increasing-pressure-release-people-custody.

[3] Federal Bureau of Prisons, COVID-19 Coronavirus, *available at* https://www.bop.gov/coronavirus/index.jsp.

supplies"; and Joseph A. Bick (2007). *Infection Control in Jails and Prisons. Clinical Infectious Diseases* 45(8):1047-1055, at https://academic.oup.com/cid/article/45/8/1047/344842 (noting that in jails "[t]he probability of transmission of potentially pathogenic organisms is increased by crowding, delays in medical evaluation and treatment, rationed access to soap, water, and clean laundry, [and] insufficient infection-control expertise").  BOP employees are complaining that they lack masks and gloves, hand sanitizer, and even soap.[4]  Pretrial detention centers—like MDC—are even more imperiled, as detainees transit through weekly.  Despite the general lockdown in New York State, BOP continues to transport inmates to and from MDC and MCC and has confirmed, on March 25, 2020, that it will not stop admitting new inmates.[5]  This exacerbates the risk of transmission. Though the BOP emphasizes that it screens inmates before moving them,[6] as the *Manrique* Court put it: "the [BOP] management plan itself acknowledges [that] symptoms of COVID-19 can begin to appear 2-14 days after exposure, so screening people based on observable symptoms is just a game of catch up. . . .  We don't know who's infected."  *Manrique*, 2020 WL 1307109, at 1.[7]

---

[4] *Federal Prison Workers Say Conflicting Orders on Coronavirus Response is Putting Lives at Risk*, CBS News (March 19, 2020), *available at* https://www.cbsnews.com/news/coronavirus-prison-federal-employees-say-conflicting-orders-putting-lives-at-risk-2020-03-19/;  Danielle Ivory, *'We Are Not a Hospital': A Prison Braces for the Coronavirus*, N.Y. Times (Mar. 17, 2020), *available at* https://www.nytimes.com/2020/03/17/us/coronavirusprisons-jails.html; Martin Kaste, *Prisons and Jails Worry About Becoming Coronavirus 'Incubators.'"* NPR (March 13, 2020), https://www.npr.org/2020/03/13/815002735/prisons-and-jails-worry-about-becoming-coronavirus-incubators.

[5] Luke Barr, *Despite Coronavirus Warnings, Federal Bureau of Prisons Still Transporting Inmates: Sources*, ABC News (March 23, 2020), https://abcnews.go.com/Health/warnings-bureau-prisons-transporting-inmates-sources/story?id=69747416%22;

[6] BOP Implementing Modified Operations, https://www.bop.gov/coronavirus/covid19_status.jsp

[7] In fact, according to information the BOP provided to the U.S. Marshals Service, the positive case at MDC Brooklyn came from a new inmate who had left Rikers on March 16, 2020, was brought to MDC Brooklyn that evening, and passed all of MDC Brooklyn's screening tests.  He became symptomatic two days later and was sent to Lutheran Hospital for testing, and returned to the MDC Brooklyn to await the results.  Between March 16, 2020 and when the positive test result was received on March 21, 2020, this inmate had contact with many other inmates and with correctional officers.

The MDC has disclosed to the Chief Judges of the Southern District of New York that as of March 25, 2020, nearly one-third of its current population is high-risk within the CDC's definition (537 inmates), creating a powerful likelihood that the coronavirus will spread throughout the facility, and particularly endanger the at-risk inmates. In the context of this unprecedented and rapidly evolving emergency, the MDC is simply not equipped to provide adequate medical attention to its detainees, let alone curb the spread of the virus. It has only three doctors on staff to care for 1700 inmates, 537 of whom are at-risk. *See* Giftos Aff, attached as Exhibit B. Indeed, as the Second Circuit recently observed, present information about the COVID-19 epidemic and the MDC's prior failings in 2019 to adequately protect detainees and allow them access to counsel and their families following a fire and power outages suggest that the virus's impact will likely be "grave and enduring." *Fed. Defs. of New York, Inc. v. Fed. Bureau of Prisons*, No. 19-1778, 2020 WL 1320886, at 12 (2d Cir. Mar. 20, 2020).

7. Lugo is particularly vulnerable to COVID-19. This Sentencing Court imposed a sentence of 41 months "to be imprisoned at Federal Medical Center Devens for treatment of emergent health conditions" (see page 2 of the Judgment). These conditions included blood in urine, kidney swelling and multiple bilateral kidney stones up to 8mm in size. Mr. Lugo's risk is heightened by the particular circumstances at MDC, which presents an ideal situation for COVID-19 to spread. There is already one confirmed positive inmate, and several other inmates are being monitored for symptoms. Mr. Lugo cannot practice regular hand hygiene, and Mr. Lugo cannot effectively socially distance himself from other inmates as the CDC cautions every person in the Unified States to do in order to stop COVID-19's spread. These are "extraordinary and compelling reasons" for his release. *See* Note 1(A) to U.S. Sentencing Guideline § 1B1.13 (expressly recognizing that "other reasons" may exist for granting compassionate release), *see* Note 1(D), § 1B1.13 Note 1(D) (recognizing that extraordinary and

compelling reasons exists "other than, or in combination with, the reasons described in subdivisions (A) through (C).").  Here, Lugo's high susceptibility to COVID-19 falls within the purview of this catchall.  Moreover, while § 1B1.13 provides helpful guidance for determining what constitutes an extraordinary and compelling reason to warrant a sentence reduction, the inquiry does not end there.  Rather, district courts have the freedom to shape the contours of what constitutes an extraordinary and compelling reason to warrant compassionate release.  Given the highly infectious nature of COVID-19, the inability in a facility like MDC to practice any of the hygienic and social distancing techniques that the Center for Disease Control has put in place to prevent rapid transmission, and the fact that Lugo suffers from ailments that have already been identified as "high risk," this Court should find that Lugo's legitimate medical risk is a sufficiently extraordinary and compelling basis for granting compassionate release.

Finally, in the last few days, other jails and prisons have already started to proactively release elderly and sick inmates who are at high risk of infection, as well as releasing as many nonviolent offenders as possible in an effort to reduce the incarcerated population and thus reduce the risk of spread.  For example, on March 25, 2020, New York City announced that it would release 300 inmates from Rikers Island. [8] Approximately 1,700 inmates have been released from Los Angeles County Jails,[9] and 1,000 inmates are to be released from New Jersey jails.[10]  Therefore, while COVID-19 remains an unprecedented emergency, many states have recognized that they have a duty to flatten the curve inside incarcerated spaces.

If released, Mr. Lugo can reside with his sister Annette Lugo, telephone: ▮▮▮▮▮▮▮, who has confirmed that Mr. Lugo can reside with her if released.  The address of her residence is ▮▮▮▮▮▮▮▮▮▮▮▮▮, Lewiston, Maine 04240.  Mr. Lugo will receive

---

[8] https://www.cnbc.com/2020/03/24/coronavirus-new-york-city-to-release-300-nonviolent-inmates-from-rikers-island.html
[9] https://www.dailynews.com/2020/03/24/l-a-county-releases-1700-inmates-from-jail-early-to-prevent-coronavirus-outbreak-behind-bars/
[10] https://www.nytimes.com/2020/03/23/nyregion/coronavirus-nj-inmates-release.html

10

appropriate medical treatment at St. Mary's Regional Medical Center in Lewiston through Medicaid.

8.  For the foregoing reasons, Lugo respectfully requests that the Court modify his sentence under 18 U.S.C. § 3582(c)(1)(A)(i) and release him to home confinement.

Dated at Portland, Maine this 6th day of April, 2020.

/s/ Neale A. Duffett, Esq. – Bar #2328

CLOUTIER, CONLEY & DUFFETT, P.A.
465 Congress Street
Portland, Maine 04101
207-775-1515

11

## CERTIFICATE OF SERVICE

    I hereby certify that on April 6, 2020 I caused the forgoing to be filed with the Court using the ECF system which will send a copy to:

- **DONALD E. CLARK**
  donald.clark@usdoj.gov,Melissa.Bubar@usdoj.gov,owen.colomb@usdoj.gov,kim.woodward@usdoj.gov,caseview.ecf@usdoj.gov,USAME.ECF@usdoj.gov,peggy.milashouskas@usdoj.gov
- **MEGHAN E. CONNELLY**
  meghan.connelly@usdoj.gov,grace.herrick@usdoj.gov,caseview.ecf@usdoj.gov,usame.ecf@usdoj.gov
- **NEALE A. DUFFETT**
  fortiera@ccdpa.com
- **DAVID B. JOYCE**
  david.joyce@usdoj.gov,grace.herrick@usdoj.gov,caseview.ecf@usdoj.gov,usame.ecf@usdoj.gov

    /s/  Neale A. Duffett, Esq. - Bar #2328