## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 2:19-cr-00056-JAW |
| | ) | |
| RAFAEL LUGO | ) | |

## ORDER ON RENEWED MOTION FOR COMPASSIONATE RELEASE

An incarcerated individual moves for compassionate release to home confinement and a period of supervised release under 18 U.S.C. § 3582(c)(1)(A)(i) after exhausting his administrative remedies.  Because the Court determines that he has not put forward extraordinary and compelling reasons justifying his release, the Court denies his request.

## I.     PROCEDURAL BACKGROUND

On December 19, 2019, the Court sentenced Rafael Lugo to forty-one months of imprisonment, three years of supervised release, a $2000 fine, and a $100 special assessment for possession with the intent to distribute heroin and cocaine, a violation of 21 U.S.C. § 841(a)(1).  *Min. Entry* (ECF No. 48); *J.* (ECF No. 49).  On April 6, 2020, Mr. Lugo filed a motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A)(i).  *Mot. for Compassionate Release* (ECF No. 52) (*Def.'s First Mot.*).  On April 8, 2020, the Government responded in opposition.  *Gov't's Opp'n to Def.'s Mot. for Compassionate Release* (ECF No. 53)  On April 10, 2020, the Court dismissed Mr. Lugo's request without prejudice for failure to comply with the exhaustion

provision of section 3582(c)(1)(A). *Order on Mot. for Compassionate Release* (ECF No. 57).

On May 5, 2020, Mr. Lugo filed a second motion for compassionate release, representing that he has now complied with the exhaustion requirement of §3582(c)(1)(A). *Renewed Mot. for Compassionate Release 18 U.S.C. § 3582* (ECF No. 58) (*Def.'s Second Mot.*). The Government responded on May 18, 2020. *Gov't's Opp'n to Def.'s Renewed Mot. for Compassionate Release* (ECF No. 59) (*Gov't's Opp'n*). Mr. Lugo replied on May 21, 2020. *Defense Reply to Gov't's Opp'n to Def.'s Renewed Mot. for Compassionate Release* (ECF No. 60) (*Def.'s Reply*). Mr. Lugo filed medical records relevant to his motion on June 1, 2020. *Me. Med. Ctr. Health Record* (ECF No. 62).

## II.   POSITIONS OF THE PARTIES

### A.   Rafael Lugo's Motion

Mr. Lugo states that having complied with the exhaustion provision of 18 U.S.C. § 3582(c)(1)(A), he "now renews his Motion for Compassionate Release (ECF 55) and incorporates it and its attachments herein." *Def.'s Second Mot.* at 1-2. In that first motion, Mr. Lugo stated, in relevant part, that he is "now incarcerated at the Metropolitan Detention Center (MDC) in Brooklyn NY (a BOP facility)." *Def.'s First Mot.* at 1. He argued that "[t]he unprecedented threat of COVID-19 could not have been foreseen at sentencing, and poses extraordinary risks to [Mr.] Lugo's health" as "[t]he virus thrives in densely packed populations" such as the MDC and "the MDC is ill-equipped to contain the pandemic and prevent COVID-19 from

infecting [Mr.] Lugo." *Id.* Mr. Lugo further contended that "[h]is kidney problems make him . . . especially vulnerable to the deadly risks of COVID-19." *Id.*

Mr. Lugo stated that "it is only a matter of time before COVID-19 spreads in the prisons," particularly in New York City, where "[t]he COVID-19 pandemic continues to roil . . . ." *Id.* at 6-7. He argued that he "is particularly vulnerable to COVID-19" because of "conditions includ[ing] blood in urine, kidney swelling and multiple bilateral kidney stones up to 8mm in size." *Id.* at 9. He represented that at MDC, he "cannot practice regular hand hygiene, and . . . cannot effectively socially distance himself . . . ." *Id.* Mr. Lugo stated that if released, he will live with his sister in Lewiston, Maine. *Id.* at 10.

In addition to his reliance on his initial compassionate release motion, Mr. Lugo states that he "remains in pain at MDC" where he "has received no treatment . . . for his unresolved and underlying medical problems;" that he "is unable to maintain appropriate social distancing" or "practice appropriate personal hygiene;" that "six inmates at MDC have tested positive for COVID-19;" and that as of May 4, 2020, 1,984 Bureau of Prisons (BOP) inmates and 356 staff had tested positive for COVID-19 across the country, with forty deaths among the incarcerated population. *Def.'s Second Mot.* at 2. Mr. Lugo further points to "an unrelated class-action lawsuit in the Eastern District of New York" in which "an independent doctor recently inspected MDC" and discovered a variety of what he termed systemic failures in the response to COVID-19. *Id.* Mr. Lugo concludes by noting that courts in the United

3

States District Court for the Southern District of New York have granted compassionate release to some individuals held at MDC. *Id.* at 3.

### B.    The Government's Opposition

The Government acknowledges that Mr. Lugo has complied with the exhaustion provision of 18 U.S.C. § 3582(c)(1)(A) and that the merits of his motion are squarely before the Court. *Gov't's Opp'n* at 4. However, the Government argues the Court should deny Mr. Lugo's request for compassionate release for two reasons: (1) that such a "reduction of sentence to time served is not warranted" because of "the seriousness of his crime, the amount of time he has served, and his personal history and characteristics" and (2) that he "has not provided any medical records or findings that kidney stones, blood in urine, and swollen kidneys provide a higher risk to obtaining COVID-19 and does not describe how his release would reduce the risk" of his contracting the virus. *Id.*

First, the Government states that "[t]he same Section 3553(a) factors that the Court considered in imposing the defendant's original sentence, approximately five months ago, continue to justify that sentence today," contending that "[t]he defendant committed a serious offense—involving possession with the intent to sell heroin and cocaine." *Id.* The Government points out that Mr. Lugo has "been incarcerated for significantly less than half of his 41-month sentence" and therefore his release "would fail entirely to satisfy any of the purposes of sentencing—here, principally the seriousness of the offense, the defendant's role, and the need for specific and general deterrence—and would not be appropriate." *Id.*

Second, the Government states that Mr. Lugo's "assertion that he has swollen kidneys, kidney stones, and blood in his urine, is plainly insufficient to warrant his release," particularly as he "has not provided any medical records to support his statement and further proffers no details how his condition relates to COVID-19." *Id.* at 5. The Government argues that Mr. Lugo "does not argue that he has any other health risks" or that he has been exposed to any individuals with COVID-19, and therefore he offers only "speculation both that he is more likely to suffer adverse health consequences if he remains in prison and that the prison would be unable to attend to such adverse health consequences if they arose," assertions which "fall well short of supporting his sentence reduction in this case." *Id.*

The Government then responds to Mr. Lugo's assertion that "the [BOP] has not taken sufficient steps in light of COVID-19," arguing that this "does not serve as an 'extraordinary or compelling' reason to place him on home confinement" for two reasons: (1) "it is unclear that the speculative risk of contracting COVID-19 is even enhanced by remaining at the MDC as opposed to a residence in Lewiston, Maine," and (2) "the MDC, like other jails around the region, has taken measures to protect inmates, including new regulations designed to reduce large gatherings, to ensure that common areas are sanitized, and to screen new inmates for signs of COVID-19." *Id.* The Government points out that "[a]s of May 14, 2020, six inmates at the MDC have tested positive for COVID-19." *Id.* at 6. The Government next lays out steps BOP has taken to mitigate the risk posed by COVID-19 within BOP facilities. *Id.* at 6-8. Finally, the Government states that "[w]hile it is true that the MDC itself is a

densely occupied detention facility, it is also by its very nature isolated from the outside world and has taken extensive steps to limit any spread." *Id.* at 8.  This is in contrast, in the Government's view, to Mr. Lugo's proposal of living with his sister in Lewiston, Maine, where she resides with her boyfriend, who daily works outside the home, and with her two children.  *Id.* at 9.  The Government further notes that as of early April, 2020, Mr. Lugo's sister was in New Jersey assisting with family care because her other brother was ill with COVID-19.  *Id.*  The Government concludes by stating that Mr. Lugo "has not proffered how his access to medical care would be improved by residing outside the MDC if he contracted COVID-19."  *Id.*

### C.   Rafael Lugo's Reply

In his reply, Mr. Lugo states that "[p]ertinent medical records . . . were provided to the Court at sentencing on December 16, 2019 and are incorporated herein by reference," noting that his counsel would be able to provide the Court with an additional copy under seal, if necessary.  *Def.'s Reply* at 1.  He states that he "shares a small cell with one other inmate" from whom he is unable to socially distance, is allowed out of his cell only three days a week to shower and use the telephone, "was given Tylenol when he arrived at MDC in early 2020 but has received no medical attention since that time while his pain and discomfort has increased," has no access to hand sanitizer, and "has been told that MDC is not his final placement and that eventually he will be sent to FCI Elkton Ohio."  *Id.* at 1-2.  Mr. Lugo then recites relevant statistics related to COVID-19 in the BOP.  *Id.* at 2.

### III.   LEGAL STANDARD

18 U.S.C. § 3582(c)(1)(A)(i) states:

> The Court may not modify a term of imprisonment once it has been imposed except that . . . in any case . . . the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment . . . after considering the factors set forth in [18 U.S.C. §] 3553(a) to the extent that they are applicable, if it finds that . . . (i) extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . ..

Where such a motion is properly before the Court, as is the case here, the Court must determine whether "extraordinary and compelling reasons warrant" the movant's release, considering in its determination "the factors set forth in section 3553(a)" and "applicable policy statements issued by the Sentencing Commission . . .." *Id.*

The United States Sentencing Commission issued a policy statement under United States Sentencing Guideline § 1B1.13 for addressing compassionate release motions under § 3582(c)(1)(A). The Guidelines note that the movant must meet the "requirements of subdivision 2 . . .." U.S.S.G. § 1B1.13, app. n.1. Subdivision 2 provides that the Court must determine that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)."

Section 3142(g) sets forth the factors a court must consider before releasing a person pending trial and these standards are incorporated into the assessment of a request for compassionate release. They include (1) the nature and circumstances of the offense, specifically whether the crime is a crime of violence or involves a

controlled substance; (2) the weight of the evidence against the person; (3) the history and characteristics of the person; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.  18 U.S.C. § 3142(g).  Regarding the history and characteristics of the person, the statute provides that the court must consider:

(A)     the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

(B)     whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law.

18 U.S.C. § 3142(g)(3)(A-B).

Once a court has made its dangerousness determination, § 1B1.13 provides that the court should determine whether "extraordinary and compelling reasons" exist to release the defendant.  U.S.S.G. § 1B1.13, app. n.1.  The policy statement provides that "extraordinary and compelling reasons" may exist under any of the following circumstances:

(A)     Medical Condition of the Defendant.

(i)     The defendant is suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (*i.e.*, a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

(ii)    The defendant is—

> (I)    suffering from a serious physical or medical condition,
>
> (II)    suffering from a serious functional or cognitive impairment, or
>
> (III)    experiencing deteriorating physical or mental health because of the aging process,
>
> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(B)    Age of the Defendant. The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

(C)    Family Circumstances.

> (i)    The death or incapacitation of the caregiver of the defendant's minor child or minor children.
>
> (ii)    The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

(D)    As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

U.S.S.G. § 1B1.13, app. n.1(A-D). The policy statement further provides that "an extraordinary and compelling reason need not have been unforeseen at the time of sentencing in order to warrant a reduction in the term of imprisonment." U.S.S.G. § 1B1.13, app. n.2. Finally, the policy statement states that "[p]ursuant to 28 U.S.C. § 994(t), rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for purposes of this policy statement." *Id.*, app. n.3.

The movant has the burden of showing that she or he is entitled to a sentence reduction, and the Court "has 'broad discretion in deciding whether to grant or deny a motion for sentence reduction.'"  *United States v. Britton*, No. 18-cr-108-LM, 2020 WL 2404969, at *2 (D.N.H. May 12, 2020) (quoting *United States v. Gileno*, No. 3:19-cr-161-(VAB)-1, 2020 WL 1307108, at *2 (D. Conn. Mar. 19, 2020)).

## IV.   FACTUAL BACKGROUND

### A.   The Criminal Case

On February 19, 2019, the Government issued a criminal complaint against Rafael Lugo, charging him with possession with intent to distribute cocaine and heroin, a violation of 18 U.S.C. § 841(a)(1).  *Compl.* (ECF No. 1).  On March 15, 2019, a federal grand jury indicted Mr. Lugo for the same crime.  *Indictment* (ECF No. 20). On June 17, 2019, Mr. Lugo pleaded guilty to the crime charged in the indictment. *Min. Entry* (ECF No. 35).  On December 19, 2019, the Court sentenced Mr. Lugo to forty-one months of incarceration, three years of supervised release, a $100 special assessment and no fine.  *J.* (ECF No. 49).  Mr. Lugo did not appeal either the conviction or the sentence.  He has been in custody since February 19, 2019.

### B.   The Presentence Investigation Report

In sentencing Mr. Lugo, the Court relied upon a Presentence Investigation Report (PSR) prepared by the United States Probation Office (PO); neither the Government nor Mr. Lugo objected to the contents of the PSR at the sentencing hearing.

### 1.   Rafael Lugo's History and Characteristics

Mr. Lugo is a forty-one-year old male born in Jersey City, New Jersey, and living in Lewiston, Maine. *PSR* at 2. The PSR says that Mr. Lugo had a "somewhat difficult upbringing." *Id.* ¶ 43. His biological father was deported to the Dominican Republic and later passed away. *Id.* Mr. Lugo was raised by his mother and step-father, Luis Concepcion, who assumed a father-figure role in Mr. Lugo's life. *Id.* ¶¶ 42-43. Mr. Lugo said that all his basic needs were met and he was never abused, but his mother and step-father fought repeatedly, which had an impact on him and his siblings. *Id.* ¶ 43. Mr. Lugo hated school and dropped out in the ninth grade. *Id.* He lived on the street, thinking it was "cool." *Id.* He has a good relationship with his mother, step-father, and siblings. *Id.*

Mr. Lugo worked as a self-employed mechanic in New Jersey before moving to the state of Maine around 2014. *Id.* ¶ 44. He moved to Maine to remove his daughter from bad influences in the city as she had begun to get into trouble. *Id.* This move was apparently good for his daughter because she intends to enroll in college. *Id.* Mr. Lugo has a sister, who lives in Lewiston, Maine and Mr. Lugo therefore moved to Lewiston. *Id.* ¶¶ 44-45. Once in Maine, Mr. Lugo began "flipping cars," and he worked in a warehouse, as a mechanic and doing construction work. *Id.* ¶¶ 51-53. Around 2017, Mr. Lugo won money at Hollywood Casino in Bangor and with the proceeds, he started his own plowing company. *Id.* ¶ 44.

According to the PSR, at the time of sentencing, Mr. Lugo was in "good physical health with no medical issues noted." *Id.* ¶ 46. At the same time, he was on several

medications and carried diagnoses of hyperlipidemia and hypertension. *Id.* The PSR also notes that Mr. Lugo "is currently experiencing kidney stone issues and 'soon may be taken to a local medical facility for evaluation.'" *Id.* Regarding his mental health, Mr. Lugo could recall no mental health diagnosis, but the PSR reflected some past mental health issues and noted that he was receiving medication for major depressive disorder. *Id.* ¶ 47.

Mr. Lugo has a history of substance abuse. *Id.* ¶ 48. He began drinking alcohol at thirteen, smoking marijuana at fifteen, and abusing powder cocaine at eighteen. *Id.* His abuse of cocaine increased to the point where he was abusing the drug three to four times per week. *Id.* As of his arrest in this case, Mr. Lugo was drinking "a couple of nips" of liquor and a six pack of beer each day and was using two to three grams of cocaine each day. *Id.* Mr. Lugo admitted that he is "not a good drunk," that he "can get nasty," and he "should not drink." *Id.* Mr. Lugo requested, and the Court recommended, that Mr. Lugo be allowed to participate in the Bureau of Prison's RDAP program. *Id.*; *J.* at 2.

### 2.  Criminal History

This is not Mr. Lugo's first criminal offense. When he was nineteen, he was convicted in New Jersey of distributing a controlled dangerous substance within 1000 feet of a school and he was sentenced to three years in prison and fined. *PSR* ¶ 24. At age twenty-six, he was convicted of a second drug-related offense, possession of cocaine, and sentenced to six months in prison. *Id.* ¶ 26.

At age twenty-six, he was also convicted of a federal offense in the United States District Court for the Eastern District of New York of Interference with Commerce by Threat or Violence.  *Id.* ¶ 27.  In a preplanned robbery, Mr. Lugo deliberately struck the victim's vehicle and then sprayed mace into the victim's face while his cohorts punched the victim in the face and robbed him of over $8000.  *Id.* He was sentenced to forty-one months of incarceration and three years of supervised release.  *Id.*  In May 2013, his supervised release was extended for six months because he violated the terms of supervised release by engaging in new criminal conduct and committing other violations as well.  *Id.*  His supervised release terminated on September 13, 2013.  *Id.*  At age twenty-seven, he was convicted in New Jersey state court of use or possession with the intent to use drug paraphernalia and was fined. *Id.* ¶ 28.  At age thirty-three, he was convicted in the state of Connecticut of having a weapon in a vehicle and was sentenced to a one-year period of incarceration.  *Id.* ¶ 29.

Mr. Lugo was scored as a Criminal History category III.  *Id.* ¶ 30.

### 3.  Nature and Circumstances of the Offense

On February 19, 2019, just after midnight, Maine State Police stopped Mr. Lugo for a lane violation.  *Id.* ¶ 5.  With Mr. Lugo was a female passenger.  *Id.*  Mr. Lugo maintained that he had never been arrested and was not on bail conditions; however, the Maine State Police Trooper was able to establish that neither of Mr. Lugo's representations was true.[1]  *Id.*  The Trooper also learned that Mr. Lugo's

---

[1]     Mr. Lugo was arrested on July 27, 2018 for operating under the influence in the state of Maine and was on bail for that offense as of February 19, 2019.  *PSR* ¶ 39.  The case had been scheduled for

license to operate a motor vehicle was suspended. *Id.* After speaking with Mr. Lugo and the passenger, the Trooper discovered they had just returned from dropping off Mr. Lugo's daughter in the New York City area. *Id.*

A Maine State Police drug detection dog alerted on both Mr. Lugo and the passenger and on the trunk of the motor vehicle. *Id.* ¶ 6. A search of the female passenger's purse revealed a Chore Boy, a cooper scouring pad often used by drug users as a filter for crack cocaine pipes. *Id.* Law enforcement found inside the trunk a gift-wrapped box and once opened, the box contained a large quantity of heroin and cocaine. *Id.* The heroin was packaged in bundles of ten, which is typical of packaging for distribution. *Id.* The drug quantity for the heroin in the trunk was 72 grams of heroin and 124.8 grams of cocaine hydrochloride.[2] *Id.*

---

a dispositional conference on February 19, 2019, but Mr. Lugo failed to appear (presumably due to his arrest in this case), and an arrest warrant issued. *Id.* On February 28, 2019, Mr. Lugo's counsel withdrew representation in the operating under the influence charge. *Id.* The arrest warrant is still outstanding. *Id.*

    In *United States v. Marrero-Pérez*, 914 F.3d 20 (1st Cir. 2019), the First Circuit wrote that "as a matter of judicial policy, in this case and henceforth, no weight should be given in sentencing to arrests not buttressed by convictions or independent proof of conduct." *Id.* at 22. As further explained by the First Circuit, a sentencing court may consider arrests when there is "greater indicia of reliability" beyond the mere fact of arrest to assure the court that "the conduct underlying the arrest[s] took place." *United States v. Rodríguez-Reyes*, 925 F.3d 558, 564 (1st Cir. 2019) (emphasis omitted) (quoting *Marrero-Pérez*, 914 F.3d at 24). The First Circuit has not extended *Marrero-Pérez* and *Rodríguez-Reyes* beyond sentencing hearings. Furthermore, at the sentencing hearing, Mr. Lugo admitted the contents of the PSR and did not contest the contents of paragraph thirty-nine of the PSR, which satisfies the First Circuit's "greater indicia of reliability" requirement.

    Despite Mr. Lugo's admission, the Court has not assumed Mr. Lugo would be convicted of the OUI. The Court does not view Mr. Lugo's acknowledgement of the correctness of the PSR to constitute an admission of the OUI itself, but of the accuracy of the fact of the charge and the circumstances of the traffic stop in this case. PSR ¶¶ 5, 39. But it has considered: (1) that Mr. Lugo committed this new federal offense while facing a new criminal charge; (2) while on bail for the OUI charge; and that when questioned by law enforcement, Mr. Lugo lied to the officer about (3) whether he had ever previously been arrested and (4) whether he was on bail. PSR ¶ 5.

[2]     The Probation Office observed that Mr. Lugo had rented a storage unit in Lewiston under his name on February 15, 2019, and had visited the unit for about twenty minutes before leaving the state of Maine. *PSR* ¶ 7. Law enforcement obtained a search warrant for the storage locker and found two shotguns, two revolvers (one revolver loaded with five rounds), as well as ammunition and a handwritten bill of sale for another revolver. *Id.* Although the PO described the issue a "close call," it

### C.  Guideline Calculations

The Court calculated a total offense level of 19 and a Criminal History Category of III for a guideline range of imprisonment of 37 to 46 months, a period of supervised release of three years, a fine of $10,000 to $1,000,000, and a special assessment of $100.  *Statement of Reasons*, Attach. 1 *Findings Affecting Sentence* at 1-2 (ECF No. 50).

## V.   DISCUSSION

The Court first addresses Mr. Lugo's motion against the criteria of the applicable statutes and Guidelines and then reviews whether he has otherwise made the case for compassionate release.  The Court turns to the conditions of Mr. Lugo's confinement.

### A.    Danger to the Community

Beginning with the first factor under the policy statement of the Guidelines, the Court concludes that Mr. Lugo has not satisfied his burden to establish that if he were released, he would not pose a danger to the safety of any other person or the community.  In making this assessment, under 18 U.S.C. § 3142(g), the Court is directed to determine whether a defendant has a history of controlled substance offenses or crimes of violence.

---

decided not to connect the firearms to Mr. Lugo's drug-trafficking offense.  *Id.*  The Court accepted the PO's assessment and did not include a firearms enhancement in its guideline calculations.  *Statement of Reasons*, Attach. 1, *Findings Affecting Sentence* (ECF No. 50).  Consistent with its position at the sentencing hearing, the Court will not tie these firearms to Mr. Lugo; however, if it had done so either at the sentencing hearing or on this petition for compassionate release, Mr. Lugo's petition would be a nonstarter due to the possibility of violence.

Mr. Lugo has both.  Mr. Lugo's current federal offense is his fourth drug-related criminal offense, and these drug-related offenses have taken place from age nineteen through age forty-one, representing a pattern of conduct.  Mr. Lugo also has committed a crime of violence, having been sentenced in federal court for the 2005 robbery, where he deliberately ran into another vehicle and sprayed the victim's face with mace.  In addition, in 2012, he was convicted of having a firearm in his vehicle.

Furthermore, at the time he was stopped with a significant amount of heroin and cocaine in the trunk of his motor vehicle, Mr. Lugo had a pending charge of operating under the influence, a crime which by its nature places the public at risk. Even assuming he did not commit the crime, he drove with a suspended license to and from the New York City area to drop off his daughter and pick up drugs.  Also, when questioned by a law enforcement officer when he was stopped for this offense, Mr. Lugo lied to the officer about whether he had ever been arrested or was then on bail.  None of Mr. Lugo's actions—which are recent—gives the Court confidence that he would not pose a risk to the public if released.

Finally, to the extent that Mr. Lugo's criminal past emanates from his troubles with addiction to alcohol and drugs, there is no indication in this record that he has undertaken any drug or alcohol rehabilitation either before or after  imposition of sentence.   On this factor alone—danger to the safety of any other person or the community—Mr. Lugo's motion for compassionate release fails.

**B.    Terminal or Serious Medical Condition**

In Mr. Lugo's petition, he only briefly refers to his medical condition:

    a.    Lugo remains in pain at MDC;

    b.    Lugo has received no treatment at MDC for his underlying medical problems that are known to this Court.

*Def.'s Second Mot.* at 2.  In his reply, Mr. Lugo states:

    1.    Pertinent medical records were provided to the Court at sentencing on December 19, 2019 and are incorporated herein by reference (if another copy is needed, I can provide them under seal).

*Def.'s Reply* at 1.  The Court requested the medical records and Attorney Duffett supplied them.  *See Me. Med. Ctr. Health Record.*  The Maine Medical Center record is dated October 15, 2019, and contains the results of a CT Scan of Mr. Lugo's abdomen and pelvis.  *Id.*  The CT Scan revealed that Mr. Lugo was complaining of right flank pain, that he had blood in his urine, and that at some point in the past, he underwent a lithotripsy procedure (which is for kidney stones).  *Id.*  The CT Scan showed the presence of "multiple bilateral nonobstructing renal calculi," the largest being eight millimeters.  *Id.*  Mr. Lugo produced no additional medical records and there is no confirmation in this record of any treatment plan.

As discussed above, the PSR discusses Mr. Lugo's physical condition by saying that he "reported that he is in good health with no medical issues known."  *PSR* ¶ 46.  After the Probation Office interview, the PSR stated that Mr. Lugo reported kidney stone issues and said that he might soon be taken to a local medical facility for evaluation.  *Id.*  At the sentencing hearing, his counsel requested that the Court recommend Mr. Lugo serve his sentence at Devens Medical Center for treatment of an emergent medical condition, namely his kidney stones, and the Court agreed to make this recommendation to the Bureau of Prisons.  *J.* at 2 (ECF No. 49).

The PSR lists nine medications that Mr. Lugo was taking about the same time as his sentencing hearing.  At the sentencing hearing, Mr. Lugo said that he was suffering from kidney stones, high blood pressure, and that he had a seven-year history of migraines which he treated with Excedrin.

For the kidney stones, the condition documented by medical records, Mr. Lugo's presentation lacks any evidence linking the presence of kidney stones to an increased risk of significant consequences from COVID-19.  Similarly, Mr. Lugo's problems with migraine headaches do not appear to make him more susceptible to COVID-19.  In the attached sworn statement of Dr. Homer Venters, the doctor mentions hypertension as a risk factor for COVID-19.  *Def.'s Second Mot.* Attach. 3, *Facility Eval.: Metro. Detention Ctr. COVID-19 Resp.* ¶ 52 (*Venters MDC Eval.*).  But the Court is uncertain whether hypertension alone, even hypertension controlled by medication, presents an enhanced risk for Mr. Lugo and the Court is not clear, other than the statement that Mr. Lugo has hypertension, that his particular medical condition places him at a heightened risk if he contracted coronavirus.  In the words of the policy statement of the Guidelines, the Court is not convinced that Mr. Lugo suffers either from a terminal or serious medical condition.

### C.    Age of the Defendant

The policy statement of the Guidelines states that to be eligible for compassionate release based on age, a defendant must be at least sixty-five years old, must have experienced a serious deterioration of mental or physical health due to the

aging process, and must have served either ten years or seventy-five percent of his prison term.  Mr. Lugo has satisfied none of these criteria.

### D.    Family Circumstances

The policy statement of the Guidelines states that to be eligible for compassionate release based on family circumstances, a defendant must demonstrate the death or incapacitation of the caregiver of a defendant's minor children or the incapacitation of the defendant's spouse or registered partner, should the defendant be the only available caregiver for the spouse or partner.  Mr. Lugo has no minor children and he is not married.

### E.    BOP Determination

The policy statement states that to be eligible for compassionate release for other reasons, the BOP must have determined there is an extraordinary and compelling reason other than or in combination with the other factors that support a defendant's compassionate release.  Here, the BOP rejected Mr. Lugo's request for early release.

### F.    Statutory and Guideline Conclusion

Applying the applicable statutes and policy statement of the Guidelines, the Court concludes that Mr. Lugo has not made out a case for compassionate release.

### G.    The COVID-19 Virus and Mr. Lugo

This is no ordinary time.  To support his claim for compassionate release, Mr. Lugo points to the COVID-19 pandemic.  The Court acknowledges that it has the authority to release Mr. Lugo even though he fails to meet the criteria of the policy

statement of the Guidelines if it is convinced that he otherwise has demonstrated "extraordinary and compelling reasons" for release under 18 U.S.C. § 3582(c)(1)(A)(i). *See Britton*, 2020 WL 2404969, at *2 ("broad discretion in deciding whether to grant or deny a motion for sentence reduction" (quoting *Gileno*, 2020 WL 1307108, at*2)). The Court has discussed its conclusion that Mr. Lugo failed to demonstrate that his medical condition and age make him especially vulnerable to COVID-19. Neither has Mr. Lugo shown the Court that his proposed residential placement in the state of Maine—living with his sister—would sufficiently isolate him from others that he would not be at risk of giving or receiving the virus.

Finally, the Court turns to Mr. Lugo's concerns about the conditions of his current confinement at MDC. Mr. Lugo attached a facility evaluation of MDC by Dr. Homer Venters, a physician and epidemiologist with a special expertise in the health of prisoners. *Venters MDC Eval.* at 1-22. Dr. Venters is highly critical of MDC and makes nineteen recommendations to the BOP that he urges the MDC to implement "as soon as possible" to mitigate the spread of COVID-19 within the MDC. *Id.* at 19-22. In response, the Government attached a letter dated May 14, 2020, from Warden D. Edge of the MDC to Chief Judge Roslynn R. Mauskopf of the Eastern District of New York, outlining steps the BOP has taken to mitigate the spread of COVID-19, some of which addressed Dr. Venters' concerns. *Compare Venters MDC Eval.* at 19-22 *with Gov't's Opp'n*, Attach. 1, *Letter from M. Licon-Vitale and D. Edge to Hon. Roslynn R. Mauskopf* at 1-2.

Mr. Lugo also attached to his motion the opinions of two judges in the United States District Court for the Southern District of New York releasing the defendants in those cases. *Def.'s Second Mot.*, Attach. 4, *United States v. Smith*, No. 12-cr-133-(JFK) (*Smith*); *id.*, Attach. 5, *United States v. Perez*, No. 17-cr-119-3 (AT) (*Perez*). The Court finds neither judicial decision helpful to the resolution of this motion. In *Smith*, the Government conceded that the defendant had demonstrated extraordinary and compelling reasons for immediate release, the defendant had multiple medical conditions, including bone cancer, and he had served ninety-eight months of a one-hundred-and twenty-month sentence. *Smith* at 1-3. In *Perez*, like *Smith*, the Government did not contest the motion and the defendant was suffering from severe medical conditions from two violent beatings he had received while a prisoner. *Perez* at 1-2. Furthermore, the release order was dated April 1, 2020, and the defendant was scheduled to be released on April 17, 2020. *Id.* at 1.

Even if the Court accepts Mr. Lugo's assertions that the BOP can and should do a better job of protecting inmates at the MDC from the spread of COVID-19, the Court is not convinced that Mr. Lugo presents with a heightened level of risk that justifies his immediate release or that he does not present a heightened risk to the community if immediately released. The legal standard for release places a burden on the inmate to demonstrate "extraordinary and compelling" reasons for his release. Taking all the circumstances into consideration, the Court concludes Rafael Lugo has failed to meet his burden.

## VI.   CONCLUSION

The Court DENIES Rafael Lugo's Motion for Compassionate Release (ECF No.

58).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 4th day of June, 2020

22